JASON M. FRIERSON
United States Attorney
Nevada Bar Number 7709
EDWARD G. VERONDA
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: 702.388.6336
edward.g.veronda@usdoj.gov
*Attorneys for the United States*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:18-CR-00255-JAD-EJY |
| Plaintiff, | **Government's Sentencing Memorandum** |
| v. | |
| CHARLES ELLIS, | |
| Defendant. | |

      The Court sat through three days of the testimony of over a dozen Government witnesses and admitted over a hundred trial exhibits. Charles Ellis plead guilty at the conclusion of the Government's Case-in-Chief. What more does the Court need to know from the Government before sentencing Ellis, when it is already well informed of Ellis's offense conduct? The answer is a lot more. Due to the bifurcated nature of the criminal justice system—that juries decide guilt, and the Court decides punishment—the Government did not present evidence to the jury that it now provides to the Court in this sentencing memo. This sentencing memo details what legendary radio host Paul Harvey called, "The Rest of the Story."[1]

---

[1] *See* https://en.wikipedia.org/wiki/The_Rest_of_the_Story

In short, the serious harm caused by Ellis's offense conduct cannot be understated: his supply of over 200 firearms resulted in the deaths of a law enforcement officer in California and a civilian in Mexico. The consequences of his sales—although the criminal conduct stopped just before the Indictment in 2018[2]—will continue long after this sentencing hearing in 2023. After the trial, but before the filing of this sentencing memorandum, *another* firearm sold by Ellis was recovered in Mexico. In June—only two months before the filing of this sentencing memorandum—San Diego Police Department recovered one of Charles Ellis's guns from a gang member. Law enforcement may continue to find and seize other firearms in the future.

Although Ellis's actions reflect his indifference to the harms set in motion by his unlicensed dealing, it is also true that Ellis has a Criminal History Category of I and is 69 years old. The government has considered and accounted for these factors in its sentencing position. Therefore, the Government submits that a sentence at the low end of the guideline range - 51 months' custody for each count, to run concurrent to each other, followed by three years of supervision, for the reasons articulated below, is sufficient, but not greater than, necessary to reflect the history and characteristics of the defendant, reflect the nature and circumstances of the offense, and to promote respect for the law, deter criminal conduct, and protect the public from future crimes of the defendant.

---

[2] Despite Ellis's repeated texts to family and friends that he needed to "get out of the business," his unlicensed dealing came to an abrupt end the day law enforcement officers executed a search warrant on his home, seizing his firearms and making plain that Ellis was the subject of a federal investigation.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Ellis's Total Offense Level is 24.**

The Government agrees with the Pre-Sentencing Report's ("PSR") calculation, which starts with a base offense level of 12, adds 10 levels for the specific characteristic for selling 200 or more firearms, adds 4 levels for engaging in the buying and selling firearms illegally, and only provides a 2-level decrease for Acceptance of Responsibility. The Government not only prepared for trial—it conducted a trial—and therefore Ellis should not receive the third point for acceptance of responsibility under U.S.S.G. § 3E1.1(b). Therefore, Ellis's total Offense Level is 24, calculated as follows:

| Offense Level Calculation | | USSG |
|---|---|---|
| Base Offense Level | 12 | § 2K2.1(a)(7) |
| 200 or more guns | +10 | § 2K2.1(b)(1)(E) |
| Engaged in Buying and Selling Firearms | +4 | § 2K2.1(b)(5) |
| **Adjusted Offense Level** | **26** | |
| Contingent Reduction for Acceptance of Responsibility | -2 | § 3E1.1(a) |
| **Total Offense Level** | **24** | |

**II.    Ellis's Offense Conduct Armed the Crimes of Felons, Murderers, and Other Criminals, and Its Effects Will Continue for Years Beyond His Sentencing Hearing Date.**

Ellis's knowing and willful conduct selling hundreds of firearms without a business license supplied criminals with firearms. Unfortunately, some of these firearms were used, resulting in deadly consequences.

On August 30, 2017, Thomas Daniel Little Cloud—a convicted felon—shot and killed Sacramento County Sheriff's Department Deputy Bill French.[3] He also shot and

---

[3] "Man accused of killing deputy, injuring 2 CHP officers dies," September 2, 2017, KCRA 3. *See* https://www.kcra.com/article/man-accused-of-killing-deputy-injuring-2-chp-officers-dies-

3

wounded California Highway Patrol Investigators John Wilson and Dave Woodruff. Deputy French and Investigators Wilson and Woodruff were investigating a stolen vehicle and attempted to enter Little Cloud's hotel room. During the intervention, Little Cloud shot all three officers with an AK-47-style assault pistol: a Zastava, model N-Pap M70, 7.62mm caliber bearing Serial Number N-PAP055046. After a high-speed pursuit in the stolen car, Little Cloud crashed the vehicle and was arrested. Little Cloud died as the result of gunshot wounds during his shootout with law enforcement. Charles Ellis bought the Zastava Little Cloud used on February 25, 2017, in Las Vegas, Nevada. According to his own sales records, Charles Ellis sold that firearm eight days later, on March 5, 2017, to another individual who was not Little Cloud.[4] About 178 days later, that Zastava killed or wounded three people. While this was a murder that focused law enforcement to start investigating Ellis, it was, unfortunately, not the only murder that one of Ellis's guns was involved in.

California was not the only place where one of Ellis's firearms was used in a homicide. On September 21, 2017, Ellis bought in Las Vegas, Nevada a Century Arms International Rifle, Model RAS47, bearing serial number RAS47082457. *Two days* later, Ellis sold that firearm.[5] Within two years, the Century Arms International Rifle was seized in Guadalajara, Mexico, where, according to police reports received from Mexico, the firearm was used in a homicide.[6]

---

1/12151952# (last accessed on August 21, 2023). The investigative reports of the Little Cloud murder were provided in discovery to counsel. They are available to the Court upon request.
[4] *See* Exhibit 27a, "By Sale Date" chart, column 143.
[5] *See* Exhibit 27a, "By Sale Date" chart, column 224.
[6] These Mexican police reports, written in Spanish, were provided to counsel as part of discovery. They are available to the Court upon request, and relevant portions would be translated into English if the Court so requests the underlying reports.

Guns have been seized by law enforcement in California, Nevada, Oregon and Mexico. All of them were sold by Charles Ellis, often within days of his original purchase. Provided in discovery to counsel for this case, but not presented to the jury, included police reports or ATF trace records for law enforcement police recoveries—often felons or other prohibited persons—in Las Vegas, Nevada, Oakland, Alhambra, and Los Angeles, California, and even as far away as Opa Locka, Florida and Baltimore, Maryland.

By its very nature, this is a crime that—although halted by law enforcement intervention in 2018—communities across the United States and elsewhere will continue to suffer from Ellis's greed in the years to come. The Government submits that in the future, law enforcement will continue to find guns belonging to Charles Ellis. Around April 9, 2023, after the jury trial and change of plea in this case, a Zastava PAP MP2 V, bearing serial number M92PV070394 was recovered in Mexico.[7] On June 13, 2023, the San Diego Police Department recovered a Century Arms International, bearing serial number RAS47P002325.[8] According to the ATF Trace Record, the gun belonged to a gang member of the "62 East Coast Crips."[9] In late July, about one month before Ellis's scheduled sentencing date, the Government received notice that yet another of Ellis's firearms was seized in Oregon around March of this year.[10] According to the Sheriff's report, the Hi-Point pistol Ellis sold was used by someone to commit an armed robbery.[11]

---

[7] *See* Government Sentencing Exhibit 1. ATF Certified Trace Report from June 27, 2023.
[8] *Id.*
[9] *Id.*
[10] Government Sentencing Exhibit 2, an *uncertified* copy of the ATF Trace Report. The Government requested a certified copy, but has not received one yet.
[11] The Sheriff's report is available to the Court for an *in camera* inspection, if requested by the Court. The Government does not attach it as a public exhibit because investigation into co-conspirators is ongoing.

5

1    While the Government is not arguing that Ellis knowingly contributed directly to
2    these murders, robberies, and law enforcement seizures, they are certainly proof that Ellis's
3    offense conduct covered a wide scope that impacted many lives. This impact from selling
4    over 200 firearms without a proper business license is not over—and more guns will
5    continue to be recovered in the future.
6    The illegal sale of firearms is a serious crime. The District of Nevada unfortunately
7    leads the nation in illegally possessed or used firearms being traced backed to the District.[12]
8    Law enforcement faces particular challenges in combating illegal sales of firearms through
9    private sales of firearms, such as the ones Ellis conducted.[13] Straw purchases create even
10   more obstacles and challenges for law enforcement to combat the illegal sale of firearms. As
11   the updated 2016 GAO report on gun trafficking noted, "[W]ithin the United States, [drug
12   trafficking organizations] or their agents typically rely on 'straw purchasers.' . . . Firearm
13   trafficking organizations also frequently obtain firearms from unlicensed private sellers in
14   secondary markets, particularly at gun shows and flea markets or through classified ads or
15   private-party Internet postings."[14]
16   The evidence demonstrates that straw buyers took advantage of Charles Ellis's "no
17   background" and "no tax" sales he offered. As a result, people's lives and communities have
18   been affected. These factors support a custodial sentence of 51 months custody as sufficient

---

[12] https://www.thetrace.org/2019/10/gun-trafficking-hubs-atf-time-to-crime/ ("the states leading the pack include Nevada, Missouri, and Virginia") (last accessed on August 21, 2023)
[13] *See* U.S. Government Accountability Office: Firearms Trafficking Report (2009), page 3; https://www.gao.gov/assets/gao-09-709.pdf (last accessed on August 21, 2023)
[14] U.S. Government Accountability Office: Firearms Trafficking Report (2016) https://www.gao.gov/assets/gao-16-223.pdf ((last accessed on August 21, 2023).

6

and not greater than necessary because of the nature of this offense and the need for deterrence.

### III. Ellis Would Not Stop His Own Criminal Conduct, Even Though He Knew It Was Wrong and Despite Private Declarations He Would Stop Out of Fear of Getting Caught

After presiding over three days of testimony, the Court is already well-aware how Ellis treated his criminal conduct as any other business—despite not being licensed to do so. Ellis kept receipts from the guns he bought. Ellis produced and kept receipts to whom the guns were sold. Ellis solicited his guns for sales to customers through text messaging. Despite acknowledgements that what he was doing was wrong and despite fear of getting caught—Ellis's conduct continued even though he promised others he would stop.

In early 2017, Ellis texted a contact: "Went good. But I'm not out of the business yet."[15] Ellis continued to buy and sell guns prolifically throughout the rest of the year in 2017. Ellis knew his conduct was wrong. On June 10, 2017, Ellis texted: "Hey Dale [.] [S]orry I missed your call[.] My second business selling guns to little kids And gang members, I'm at a gun show[.] Kind of a killer weekend[.] Too many hours standing on my feet . . ."[16] Despite Ellis knowing that "gang members" might be buying his firearms, Ellis walked into the gun show the following day, and sold out his inventory. That day, Ellis texted a contact: "Wow. I sold every single pistol. Only the one strapped to my leg is the last one I own." [17] If taken literally, Ellis had the chance to walk away from his business in June 2017. But Ellis didn't. According to the evidence presented, Ellis continued to sell at gun shows. After the October 1, 2017, shooting in Las Vegas that killed 58 people, Ellis

---

[15] See Exhibit 30a, line 1.
[16] See Exhibit 30b, line 1.
[17] See Exhibit 30g, line 4.

sent text messages to contacts expressing fear that one of his firearms may have been involved in the shooting.[18] Despite these fears, Ellis continued to buy and sell guns according to official purchasing records, and Ellis's own sale records and receipts.

After a few more months of his criminal conduct, on December 28, 2017, Ellis texted a contact in response to the contact saying Ellis was a "gun show junkie": "You helped me start this[.] 250 guns later."[19] Ellis continued texting:

> "Yeah I know that's what my son says to (*sic*)
> But the ATF has opened
> An audit at my friend Gun store
> After Vegas shooting things are pretty tight
> After 450 guns it looks like it's time to get out
> of the business."[20]

Ellis then finished: "Before you have to visit me at sing sing."[21]

Again, Ellis—concerned about a potential sentence of imprisonment—expressed doubts about this criminal conduct in late 2017. Despite these doubts and fears, Ellis's criminal conduct continued. On January 10, 2018, Ellis bought two additional firearms.[22] One was seized in his house, but the other was never recovered (so presumably sold, although Ellis kept no record of the sale). On January 16, 2018, Ellis texted a potential buyer, soliciting the sale of a gun:

> "Hey
> Got word The Mac 10s went up to $700 ea[ch]
> Still a good deal
> No tax and no background
> Need to pay for one of them upfront and I'll
> Pick up Two . . .
> I could have the mac 10s on Friday

---

[18] These text messages were provided to counsel in discovery, but not presented to the jury. They are available to the Court upon request.
[19] See Exhibit 29h, lines 4-5.
[20] *Id.*, line 3.
[21] *Id.*, line 2.
[22] See Exhibit 27a, "By Purchase Date" chart, lines 270-271.

8

If I order them tomorrow."[23]

Over the following days of January 2018, Ellis continued to negotiate—and then finally consummate—the sale of the guns. On January 31, 2018, the buyer promised the rest of the money to be delivered the next day.[24] The following day—ATF executed a search warrant of Ellis's business and seized 11 firearms in his possession.

Thus, despite declaring it was "time to get out of the business," Ellis's criminal conduct continued up to the very day ATF's investigation went overt. For these reasons, a sentence of 51 months of custody is sufficient, but not greater than necessary to serve both individual and general deterrence, and to protect the public.

**IV.    A Lower Custodial Sentence Would Lead to Sentencing Disparities.**

As mentioned above, Ellis's guns were sold to convicted felons. These convicted felons were prosecuted in California and Nevada state courts, one even before the Honorable Judge presiding over Ellis's trial and sentencing hearing.

On October 27, 2016, Ellis purchased in Las Vegas a Masterpiece MPA10T, bearing serial number A16914.[25] The MPA10T was one of the most popular make and models for Ellis. Throughout the period of indictment, Ellis purchased and sold 27 Masterpiece Firearms. The Court heard the testimony of ATF expert Daniel Yun, who testified to the jury that the low-quality, but easily concealable, gun is popular amongst prohibited persons. *Two days* after Ellis's purchase, Ellis sold the gun to Terry Tremell Lomax. Lomax was a prohibited person. Later, Lomax was found in possession of that firearm. The

---

[23] See Exhibit 29f, line 36.
[24] *Id.*, line 2.
[25] See Exhibit 27a, "Working Table" chart, Line 61.

District of Nevada prosecuted him, and he pled guilty. This Court sentenced Lomax to 48 months custody and 3 years of supervised release.[26]

Not every convicted felon that bought from Charles Ellis was prosecuted, though. Because Ellis kept detailed records of firearms he sold, ATF was able to run the criminal histories of every person from which—according to Ellis's own records—purchased firearms from him. ATF Special Agent Mark Giacamontonio discovered that nine convicted felons bought directly from Charles Ellis.[27]

The prohibited persons represent the "demand side" of unlawful gun purchases. People such as Charles Ellis—who engage in the business of repeatedly buying and selling guns without following ATF regulations or conducting background checks—and other gun traffickers represent the "supply side." The Court has presided over countless sentencings for possession of firearms by a prohibited person. The Court is aware of the high "demand side" of unlawful gun purchases. This "demand side" would never be fulfilled or met without other criminal actors on the "supply side," such as Charles Ellis. Gun traffickers and people engaging in the businesses of repeatedly buying and selling firearms without a license help feed the high "demand side" of illegal firearms sales. It would seem counterintuitive that only criminals on the "demand side" should be punished. People such as Charles Ellis on the "supply side" need to be deterred too—otherwise the "demand side" will always be high.

Of particular note is the sheer number of firearms Charles Ellis sold, and how rare it is in the federal system that someone like Ellis is prosecuted and convicted. His elite status

---

[26] *United States v. Terry Tremell Lomax*, 2:17-cr-00262-JAD-PAL, ECF No. 54.
[27] An excel chart listing the tracing, information, and names of these convicted felons was provided to counsel in discovery, but not provided as an exhibit to the jury. It is available to the Court upon request.

as one of the most prolific suppliers of guns makes Ellis's offense that much more serious. For instance, in the Fiscal Year 2022, 9,003 federal offenders were sentenced under USSG Section 2K2.1.[28] Of those 9,003 federal offenders, only 20 offenders had the specific offense characteristic of 200 guns or more, under Section 2K1.1(b)(1)(E), applied to their offense conduct.[29] Fiscal Year 2022, though, saw a significant increase to this specific offense characteristic that rarely reached double-digits. In Fiscal Year 2021, out of 7,872 federal offenders who were sentenced under Section 2K1.1, only 8 had the application of 200 guns or more.[30] Previous Fiscal Years produced a similar scarcity of offenders who had 200 guns or more involved in their offense. Fiscal Year 2020, where 7,219 offenders were sentenced, only 7 had the application of 200 guns or more to their guideline.[31] Fiscal Year 2019, with 8,122 offenders, had only 16 offenders who had 200 guns or more applied to their guideline.[32] In other words, since Ellis committed this crime, barely 51 federal offenders across the entire federal judiciary, have been sentenced under Section 2K1.1(b)(1)(E).

---

[28] United States Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics," (Guideline Calculation Based), Fiscal Year 2022. Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2022/Ch2_Guideline_FY22.pdf. See page 129.

[29] *Id.* at page 130.

[30] United States Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics," (Guideline Calculation Based), Fiscal Year 2021. Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf. See pages 129-30.

[31] United States Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics," (Guideline Calculation Based), Fiscal Year 2020. Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf. See Page 52.

[32] United States Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics," (Guideline Calculation Based), Fiscal Year 2019. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-

Because rare is the time that a criminal offense involves the "supply side" of illegal firearms, and rarer still when that criminal offense involves as many guns as Charles Ellis sold, a sentence of 51 months of custody reflects the seriousness of the offense and the need for a just punishment. Anything less would create sentencing disparities not only among those sentenced from the "supply side," but also the "demand side" of illegally acquired firearms.

### V. Ellis's Personal History and Characteristics Weigh in Favor of a Low-End Sentence.

The government's request for a 51-month sentence is informed by Ellis's unique history and characteristics, which include his minimal criminal history and advanced age.

Ellis is 69 years old. A sentence of 51 months would provide the same amount of deterrence as a sentence of 60 months or more. Ellis also has no criminal history points, and a Criminal History Category I— arising from the absence of any other serious criminal history. While a custodial sentence—particularly one as significant as 51 months—is well-justified for the reasons stated above, the Government limits its request to the low-end because of personal history and characteristics unique to Ellis.

Accordingly, a sentence of 51 months custody is sufficient, and not greater than necessary, to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, to promote respect for the law, and to deter Ellis and others from committing future crimes.[33]

---

sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf. See Page 54.

[33] 18 U.S.C. § 3553(a)(1) and (a)(2)(A), (B), and (C).

## **CONCLUSION**

And now the Court knows . . . the *rest* of the story. For the above stated reasons, the Court should sentence Ellis to 51 months imprisonment, followed by 3 years of supervised release, with the special conditions outlined in the PSR, for the reasons identified therein.

Respectfully submitted this 21st day of August, 2023.

JASON M. FRIERSON
United States Attorney

*s/ Edward G. Veronda*
EDWARD G. VERONDA
Assistant United States Attorney